IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

CALVIN BRADSHAW, #273572           *
                Plaintiff,
        v.                    *   CIVIL ACTION NO. AW-09-01

WALTER WIRSCHING, et al.        *
                Defendants.
                    ***

**MEMORANDUM**

I.    *Background*

This 42 U.S.C. § 1983 action was received for filing on January 5, 2009 by Plaintiff, who was at all relevant times confined in  the Maryland Division of Correction.[1]  Plaintiff sues some thirty defendants, complaining that various state administrators and private healthcare staff failed to provide him: surgical repair of his right eyelid ptosis ordered by a physician in April of 2007; follow-up appointments with the University of Maryland Medical System ("UMMS") ophthalmology and neurology clinics; tinted eyeglasses with blinders as ordered by a physician; proper care for his continuing nose bleeds; Midrin medication for severe headaches, and access to his medical records.  Paper No. 1.   He further alleges that straining to keep his eye open without suggested bandages causes him to suffer from severe headaches and his sick-call visits with prison nurses are ineffectual as they cannot provide the care he requires.[2]  *Id.*   He asks to be returned to UMMS for eye surgery and neurology follow-up to his MRI testing and to have prison medical staff treat him for nose bleeds, provide him Midrin, and to otherwise furnish him

---

[1]     Plaintiff was transferred to a Kansas Department of Corrections pursuant to the Interstate Corrections Compact during the pendency of this action.

[2]     Plaintiff also claims he is experiencing "abuse" from these nurses.  Paper No. 1 at Attachment 2.

medical care without charging him for sick-call visits.    In addition to his injunctive relief

request, Plaintiff seeks compensatory and punitive damages.

II.     *Dispositive Filings*

Defendants Ryan, Bray, Wilt, Tessema, Ottey, Martin, Pratt, Brenneman, Baker, Dudley,

and Younger, the served "medical defendants," have filed a Motion to Dismiss or, in the

Alternative, for Summary Judgment, treated as a motion for summary judgment.   Paper No. 20.

An opposition, reply, and surreply were received for filing.[3]   Paper Nos. 25, 41, & 58.   State

Defendants Wirsching, Baucom, Maynard, Stouffer, Galley, Rowley, Graham, Northcraft, and

Presgraves also filed a Motion to Dismiss or, in the Alternative, Motion for Summary Judgment,[4]

which Plaintiff opposes.   Paper Nos. 30 & 57.   The court shall rule on these pleadings without

oral hearing after first addressing a number of non-dispositive pleadings filed by the parties.

III.   *Non-Dispositive Filings*

Plaintiff asks to amend his Complaint with the names of state and medical personnel from

the Kansas Department of Corrections.   Paper No. 37.   Leave to amend shall be denied.

Plaintiff fails to provide any background facts in support of his amendment.   More importantly,

this court has no venue over actions or inactions of parties in Kansas.   Plaintiff is of course free

to file a new complaint against Kansas parties in the District Court of Kansas.

Next, Plaintiff filed a Motion to Stay this case as he has been transferred to Kansas, had

not yet received his property, and cannot "fight" his case.   Paper No. 38.   Plaintiff asks that he

not be required to respond to any court orders for 90 days.  The Motion, filed on September 17,

---

[3]     The Medical Defendants' Reply also includes amended Defendant "Anika" Hebb's response.

[4]     It does not appear that service of process was effected on Defendants Phillips, Summerfield, Hammond, Burdock, Warnick, Brashies, Nottage, and Newlon.

2009, shall be denied as moot.    The 90-day period has expired and Plaintiff has filed several

documents, including a number of responsive pleadings with the court.

Plaintiff has also filed a Motion for Default Judgment seemingly asserting that counsel

for Defendants have mailed him other pleadings at his old address even though they are aware of

his change of address.   Paper No. 39.   He asks that they "lose by default." *Id*.   The Motion shall

be denied.   All served Defendants have filed timely responses to the Complaint; thus the entry of

default judgment is not appropriate.

Plaintiff seeks an extension of time to file a responsive pleading against the state

defendants.  Paper Nos. 46 & 51.  The Motions shall be denied as moot as Plaintiff has filed his

Opposition.

He next files a motion asking the court to compel the medical staff at Hutchinson

Correctional Facility in Kansas to allow him to receive copies out of his medical record in order

to file an opposition.   Paper No. 49.   Plaintiff states that he wrote the Secretary of the Kansas

Department of Corrections and was advised to contact a medical administrator and unit team

manager. *Id*.    He maintains that he was later told that the copies would not be taken from his

medical record without court or judicial order.  The court has re-examined Plaintiff's claims and

reviewed the medical records and affidavits filed as exhibits to the medical Defendants'

responsive pleadings, as well as Plaintiff Opposition and Surreply.  Paper Nos. 1, 20, 25, 41, &

58.    Plaintiff has failed to sufficiently articulate cause to compel his access to medical copy

work.   He has not established with any particularity why he could not craft a fully responsive

opposition refuting Defendants' medical claims by filing an affidavit or declaration with the

record already before the court.  Consequently, his Motion shall be denied.

Plaintiff also submits a "Motion Asking to be Granted Everything Else he asked for

Within his Opposition Motion that Medical Defendants did not Challenge in their Reply."  Paper

No. 48. He claims that "these Defendants only challenged [his] migraine headache medications."

*Id.* The Motion shall be denied. The court shall rule on the substantive merits of Plaintiff's

claims upon consideration of all responsive pleadings.

Plaintiff next files a Motion for Appointment of Counsel. Paper No. 52. He claims that

he is not an attorney, does not know much about the law, only has a seventh grade education, and

is confined in the state of Kansas without anyone to assist him. *Id.* The court finds no

exceptional circumstances warranting the appointment of counsel in this case. *See Whisenant v.*

*Yuam*, 739 F.2d 160, 163 (4th Cir. 1984). Plaintiff is a frequent litigant in this court and has

demonstrated the ability to litigate the facts and legal issues in this case.

Finally, co-counsel has filed a Motion to Withdraw as Attorney. Paper No. 66. The

Motion shall be granted. The court shall turn its attention to the Complaint and responsive

pleadings and the merits of Plaintiff's medical claims.

IV.     *Standard of Review*

The Supreme Court has established that "deliberate indifference to serious medical needs

of prisoners constitutes the 'unnecessary and wanton infliction of pain' proscribed by the Eighth

Amendment." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (quoting *Gregg v. Georgia,* 428 U.S.

153, 173,(1976)). As an inmate sentenced to confinement, Plaintiff is entitled to receive

reasonable treatment for serious medical needs. To establish a claim of an Eighth Amendment

violation, he must prove two essential elements. First, he must satisfy the "objective"

component by illustrating a serious medical condition. *See Hudson v. McMillian*, 503 U.S. 1, 9

(1992); *Estelle v. Gamble*, 429 U.S. at 105; *Shakka v. Smith*, 71 F.3d 162, 166 (4th Cir. 1995);

*Johnson v. Quinones*, 145 F.3d 164, 167 (4th Cir. 1998). He must then prove the subjective

component of the Eighth Amendment standard by showing deliberate indifference on the part of

prison officials or health care personnel. *See Wilson v. Seiter*, 501 U.S. 294, 303 (1991) (holding

4

that claims alleging inadequate medical care are subject to the "deliberate indifference" standard outlined in *Estelle*, 429 U.S. at 105-06). "[D]eliberate indifference entails something more than mere negligence [but] is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Farmer v. Brennan*, 511 U.S. 825, 835 (1994).  Personnel "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and [they] must also draw the inference." *Id*. at 837. A defendant cannot be held liable for medical treatment in which they played no role.   Liability under § 1983 is predicated upon an affirmative link or connection between the defendants' actions and the claimed deprivations.    *See Rizzo v. Goode,* 423 U.S. 362, 372-73 (1976). Further, the Eighth Amendment is not implicated by an inmate's complaint over the adequacy of the care he or she received when those claims amount to a disagreement over the appropriateness of the issuance of medication or medical devices.   *See Veloz v. New York*, 339 F.Supp.2d 505, 525 (S.D.  N.Y. 2004).

V.      *Analysis*

According to the records filed in earlier civil rights actions, Plaintiff has a history of a penetrating head injury from a stab wound occurring in February of 2004 which resulted in transection of his optic nerve, blindness of the right eye, and ptosis of the right eyelid.[5]   His head injury causes migraine headaches. *See Bradshaw v. Maynard, et al.*, Civil Action No. AW-07-608 (D. Md.) and *Bradshaw v. Rowley, et al.*, Civil Action No. AW-07-1270 (D. Md.). Exhibits in those cases show that tinted eyeglasses with "blinders"on each side were ordered for Plaintiff

---

[5]      Ptosis refers to the sinking down of an organ. *See* Stedman's Medical Dictionary P. 1481, 27th Ed. 2000.   In Plaintiff's case this involves the drooping of the upper eyelid.  In most cases, it is caused by either a weakness of the levator muscle (muscle that raises the lid), or a problem with the nerve that sends messages to the muscle. *See* http://www.stlukeseye.com/conditions/Ptosis.asp.

by UMMS personnel in 2006 and  2007, due to photosensitivity, and in 2004, Plaintiff received

an MRI which showed a very small right temporal lobe arachnoid cyst.

The court now turns to the recent history of Plaintiff's medical care as set out in the

records presented to the court.

MEDICAL DEFENDANTS

Headaches and Prescription Medication

From April of 2007 to July of 2009, Plaintiff filed approximately 100 sick-call request

forms and other informal requests to be seen for migraine headaches.  Defendants state that

neurologists at UMMS are monitoring Plaintiff's headaches.  A neurology appointment

scheduled in 2007, was cancelled by UMMS staff as unnecessary.  A follow-up evaluation at

UMMS was scheduled for April of 2008.    Plaintiff was evaluated at the UMMS neurology

clinic in May of 2008.   His condition was assessed as a post-traumative headaches, possible

mental neuropathy, and positional headache with an unclear cause.  A neurologist recommended

starting Neurontin, a medication used to treat nerve pain and discontinuing Plaintiff's

Nortriptyline. Both medications are used to treat nerve pain.   Dr. Tessema determined that the

Nortriptyline was effectively treating Plaintiff's nerve pain and it was appropriate to continue the

medication.

In 2007, Plaintiff's Midrin prescription was renewed on an "as needed" basis.   The

frequency of the daily dosage of the prescription was changed throughout 2007.   Defendants

claim that Plaintiff complained at times that he was not receiving Midrin, while healthcare staff

claimed that he was refusing to take the medication when the daily frequency was increased.

Records indicate that Plaintiff did receive the Midrin prescription and his prescription plan was

periodically modified in 2007 in an effort to provide the best treatment at the onset of his

headaches.

6

In May of 2008, Plaintiff informed a nurse that his headaches were increasingly in intensity.  The nurse, however, noted no objective signs of distress and referred Plaintiff to a physician.   On the occasions that he complained of headaches, he was seen by healthcare staff, prescribed Midrin medication, and provided an MRI, with normal results.   In July of 2009, Neurontin was added to his nerve pain regimen of Nortriptyline.

<u>Medical Care for Eye Condition</u>

Plaintiff filed approximately 60 sick-call encounter forms regarding eye problems since April of 2007.  The UMMS Ophthalmology clinic recommended that Plaintiff receive safety glasses with peripheral blinders, resume warm compresses, lid scrubs, artificial tear drops twice a day, and follow up with a neurologist at UMMS.   The ophthalmologist indicated that Plaintiff could be treated for his ptosis after his headaches were treated.  On May 2, 2007,  Plaintiff received a pair of safety glasses to wear until his prescription safety glasses became available. He complained, however, that they did not have blinders.  On May 18, 2007, Plaintiff was seen by an optometrist who fitted him for his prescription safety glasses.   Defendants claim that he received the prescription safety glasses with blinders in June of 2007.

Plaintiff requested and received eye ointment, in addition to the eye drops he was receiving.   On August 16, 2007, Plaintiff was seen by the on-site ophthalmologist, Dr. Summerfield.   He determined that Plaintiff's headaches were not caused by his eyes, despite Plaintiff's complaint that light caused his headaches and that he required tinted eyeglasses. Tinted eyeglasses were not recommended.   A new pair of eyeglasses was provided on September 7, 2007.

Plaintiff filed sick-call requests complaining that his glasses should be tinted and have blinders on them.  He was seen by Dr. Summerfield on November 14, 2007.  Dr. Summerfield found Plaintiff difficult to assess because of his "inconsistent responses and combativeness."  He

recommended that Plaintiff wear eyeglasses with polycarbonate lenses at all times.   In January

of 2008 a follow-up consultation at the UMMS Ophthalmology clinic was ordered.

In March of 2008 Dr. Summerfield again saw Plaintiff and noted that he was doing well

with the polycarbonate lenses.  He also observed that Plaintiff was using a band-aid on his right

eye to hold up the eyelid.  Dr. Summerfield concluded that Plaintiff did not need eyelid surgery,

tinted glasses, or blinders on his glasses and that he could stop using the band-aid on his eyelid.

He recommended that Plaintiff return to the ophthalmology clinic in six to eight months.

Plaintiff continued to file sick-call request forms in June and July of 2008, complaining

that his eyes were red, burning, and sensitive to light.  He was seen by nursing staff and referred

to a physician.   Dr. Tessema referred Plaintiff to an optometrist.  On August 17, 2008, Plaintiff

was seen by an optometrist and prescribed tinted eyeglasses, which he received on September 27,

2008.    Plaintiff continued, however, to file sick-call requests asking for glasses with blinders.

On April 10, 2009, he received a box of band-aids to hold his right eyelid up and his eye

medications were renewed.  On May 15, 2009, Plaintiff received a pair of tinted prescription

eyeglasses.

Medical Treatment for Nose Bleeds

Defendants state that Plaintiff has filed approximately 50 sick-call slips complaining of

nose bleeds.  Salt water nasal spray and cholortrimeton were prescribed to keep his nasal

passages moist and to help prevent nose bleeds.  Defendants note that during the course of

numerous examinations, no one observed any visible signs of active nose bleeding .  Plaintiff

was advised to apply pressure to his nose to stop any bleeding.[6]

---

[6]      In his responsive pleadings Plaintiff claims that he showed evidence of his nose bleeds to a prison nurse.  He further provides affidavits from  inmates who attest to hearing Plaintiff complain of nose bleeds.

Medical Staff Abuse

Defendants state that Plaintiff was routinely seen by nurses in response to his sick-call requests as inmate are initially screened by nurses to determine the urgency of their conditions. They seemingly note that Plaintiff's sick call screening by prison nurses was performed in an objective and customary triage manner, without any "abuse." Defendants do maintain that on several occasions Plaintiff refused to be assessed by the nurses because he believed that only a doctor, not a nurse, could treat him. Defendants also contend that Plaintiff was provided access to his medical records in May and December of 2008 and given hundreds of pages that he requested. They assert that at no point was Plaintiff denied copy work from his record.

STATE DEFENDANTS

The state Defendants asserts that Plaintiff does not raise any specific claims against them aside from the "blanket" charge that they failed to adhere to regulations with regard to medical treatment. NBCI Warden Bobby Shearin affirms that in matters of medical complaints, he is entitled to defer to the expertise of medical authorities. The state Defendants otherwise adopt and incorporate by reference the medical record and affidavits filed by the medical Defendants.

Findings

The court has examined the Complaint and all arguments, exhibits, and affidavits presented in the responsive pleadings. The record shows that Plaintiff was frequently monitored, evaluated, and treated for his various ailments by on- and off-site physicians. He was placed on a prescription regimen for his headaches which was periodically reviewed and altered as needed, he was evaluated at the UMMS Neurology Clinic on several occasions, and he received an MRI in July of 2008, which showed no signs of an arachnoid cyst. As to his eye problems, Plaintiff was referred to and received consultations at the UMMS Ophthalmology Clinic and was given eye drops and ointment, safety glasses, consults with the on-site ophthalmologist and

optometrist, and tinted prescription eyeglasses.  His nose bleeds were treated with saline nasal spray and decongestants, and he was given instruction as to how to respond to the nose bleeds.

Plaintiff may disagree with the course of treatment for his ailments, but this does not comprise an Eighth Amendment deprivation.  Further, while there may have been problems with the timing of and delays in the receipt of his Midrin medication for his headaches, the distribution of prescribed eyewear, and the scheduling of follow-up consultations, there is no evidence that the delays constituted a deliberate pattern or practice of the denial of medical care. Further, the verified record shows that Plaintiff obtained access to his voluminous medical record, requested hundreds of pages of copy work, and received them.

VI. *Conclusion*

For the aforementioned reasons, Defendants' dispositive motions, construed as motions for summary judgment shall be granted.[7]  A separate Order follows. [8]


Date:  January 19, 2010                              _____/s/_____
                                                     Alexander Williams, Jr.
                                                     United States District Judge

---

[7]       Given his transfer to the Kansas Department of Corrections, Plaintiff's request for injunctive relief has been rendered moot.

[8]       In light of the failure to find an Eighth Amendment deprivation, the Complaint against Defendants Phillips, Summerfield, Hammond, Burdock, Warnick, Brashies, Nottage, and Newlon shall be dismissed.